UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

MARK DANIEL CABAGUA,

        Plaintiff,

        v.                                          Case No. 24-cv-0022-scd

JULIE LUDWIG et al.,

        Defendants.

---

## DECISION AND ORDER

---

      Plaintiff Mark Daniel Cabagua, who is incarcerated at Oshkosh Correctional Institution, is representing himself in this 42 U.S.C. §1983 action. He is proceeding on Eighth Amendment claims based on allegations that Defendants were deliberately indifferent to his serious dental needs. On May 5, 2025, Defendant Eunice Vachet moved for summary judgment. Dkt. No. 63. A few months later, on August 22, 2025, Defendants Cynthia Kirchhoff, Julie Ludwig, Angelo Panos, and Maria Punla Smith (the State Defendants) also moved for summary judgment. Dkt. No. 80. For the reasons explained below, the Court will grant Dr. Vachet's motion and will grant in part and deny in part the State Defendants' motion.

## BACKGROUND

      At the relevant time, Cabagua was housed at the Oshkosh Correctional Institution. Dr. Vachet worked there as a dentist from March 2019 until May 2021. Dr. Punla Smith has worked there as a dentist since May 2021. Kirchhoff has worked as a dental assistant at the institution since April 1998. Ludwig was the institution's nursing supervisor/health services manager, and Dr. Panos was the dental director for the Wisconsin Bureau of Health Services. Dkt. No. 98 at ¶¶1-6; Dkt. No. 74 at ¶¶2.

On December 14, 2020, Cabagua submitted a dental services request that stated: "My tooth is deteriorating at a seriously rapid pace. Can you please set me up on an appointment to fix the problem before it gets worse. Thanks." Dkt. No. 1-3 at 18. Dr. Vachet explains that she did not review this request, but because the request does not mention pain, a broken filling, or any other concerning symptoms, Cabagua was appropriately placed on the routine waitlist. Per policy, a patient on the routine waitlist should be examined within forty weeks. Less than a month later, on January 11, 2021, Cabagua submitted another dental services request in which he stated: "My tooth continues to deteriorate at an alarming rate. Can you please set me an appointment as soon as possible. Thanks." Dkt. No. 1-3 at 19. Dr. Vachet again notes that the request did not mention pain, a broken filling, or any other concerning symptoms. Dr. Vachet reviewed the request and agreed that it was appropriate for Cabagua to remain on the routine waitlist. Dkt. No. 74 at ¶¶11(a)-11(b); Dkt. No. 98 at ¶¶38-39.

About two months later, on March 15, 2021, Cabagua submitted another dental services request, in which he stated: "My tooth continues to get worse. I would like to have it fixed before it gets infected and has to be extracted." Dkt. No. 1-3 at 20. As with the two prior requests, this request does not mention pain, a broken filling, or any other concerning symptoms that Dr. Vachet believed required urgent attention. Kirchner responded to the request and again informed Cabagua that he was on the waitlist, noting "[d]ue to COVID we are behind." A few weeks later, on April 8, 2021, Cabagua submitted a request form that stated: "My tooth continues to get worse and now the one next to it is also deteriorating. Can you please help me because I do not want to lose anymore teeth. Thanks." Dr. Vachet notes that this was the first time that Cabagua mentioned a problem with more than one tooth. Based on the report of this new issue, Dr. Vachet decided he

2

should be seen promptly, so he was added to the essential waitlist, which has a maximum wait period of eight weeks. Dkt. No. 74 at ¶¶11(c)-11(d); Dkt. No. 98 at ¶¶40-41.

Less than a week later, on April 13, 2021, Dr. Vachet gave Cabagua a comprehensive oral exam, including x-rays, an oral cancer exam, and a periodontal exam. She also checked Cabagua's electronic medical records and noted that he already had Naproxen and acetaminophen for pain related to other conditions, so she did not prescribe additional pain medications. Dr. Vachet had a follow-up appointment with Cabagua a week later, on April 20, 2021. The appointment notes indicate that Cabagua presented with no visible pain, infection, swelling, or fever. Dr. Vachet installed a temporary restoration on tooth #11 and made plans to install a permanent restoration. Dr. Vachet believed that this was the tooth that Cabagua had initially complained about, but Cabagua asserts that he had been complaining about tooth #12. Dr. Vachet also determined that three other teeth (#3, #12, and #31) were non-restorable, so she recommended that they be extracted. She placed Cabagua on the essential waitlist to see the dentist who performed extractions at the institution. Dkt. No. 74 at ¶¶11(e)-11(f); Dkt. No. 98 at ¶¶42-45.

A week later, on April 27, 2021, Dr. Vachet saw Cabagua again and installed a permanent restoration on tooth #11. Cabagua reported that the restoration had resolved his concerns with that tooth. Cabagua was still waiting for his appointment with the dentist assigned to do extractions, but this was the last interaction that Cabagua had with Dr. Vachet, as her responsibilities for him ended after she restored tooth #12. Dkt. No. 74 at ¶¶11(g). The next day, Cabagua had an appointment with the dentist assigned to do extractions. The dentist extracted tooth #12 and tooth #31 and prescribed ibuprofen. Cabagua initially consented to also have tooth #3 extracted but he changed his mind because he did not want to stop lifting weights during the recovery and that tooth

3

was not bothering him as much as the other two. Dkt. No. 74 at ¶¶11(g); Dkt. No. 46 at 44; Dkt. No. 98 at ¶¶46-47.

On June 21, 2021, Cabagua submitted a dental services request in which he stated he was having pain. Dr. Punla Smith reviewed the request and placed Cabagua on the essential waitlist. She saw him the next day, at which time he reported pressure and a headache in the area where tooth #12 had been extracted. Cabagua also asserts that he complained about pain in the area of other teeth as well. Dr. Punla Smith completed a visual exam and took some x-rays. She observed healthy tissue at the extraction site but noted that some teeth had root tips in the sinus, which can sometimes cause pain when someone has allergies or a sinus infection. She suggested that Cabagua speak to his doctor. Dkt. No. 98 at ¶¶49.

Four months passed, and Cabagua submitted no complaints about his teeth. On November 2, 2021, Cabagua had a routine hygiene visit with a dental hygienist (not a Defendant), who noted caries in tooth #9. She informed Cabagua that the tooth would be evaluated at a restorative appointment. She encouraged him to put in a slip for a filling and for evaluation of tooth #3, the tooth that Cabagua decided not to extract despite two dentists' recommendations. Dr. Punla Smith received a dental services request from Cabagua a couple of days later in which he stated: "I had my teeth cleaned on 11-2-21 and the hygienist stated that I need a filling on my front tooth. Can you please set me up an appointment to get it filled as soon as possible. I don't want to lose my front tooth. Thanks." Dkt. No. 1-3 at 30. Dr. Punla Smith placed Cabagua on the hygiene list for 2022, but not on the routine waitlist to have his front tooth filled. A few weeks later, on December 16, 2021, Cabagua submitted a second request regarding tooth #9, stating: "When I had my teeth cleaned the hygienist stated that my front tooth was cracked and that it needed to be filled as soon as possible. Can you please get me an appointment as soon as possible. I don't want it to get

infected and have to be removed." *Id*. at 31. Dr. Punla Smith then placed Cabagua on the routine waitlist. Dkt. No. 98 at ¶¶48-53.

On January 19, 2022, Cabagua submitted a dental services request stating that his front tooth was getting worse. He submitted a similar request on February 2, 2022. Both times Dr. Punla Smith informed him that he was on the routine waitlist. On March 28, 2022, he submitted a request that stated: "My front tooth continues to get worse and the other teeth that need filling are starting to hurt. Can you please get me in as soon as possible. I don't want to lose anymore teeth. Thanks." In response Dr. Punla Smith informed him that he was on the waitlist and that the dental services unit was short staffed. Dkt. No. 1-3 at 32-34. On April 24, 2022, he submitted a request that stated: "My front tooth is now sensitive to hot and cold and my other teeth that need to be filled hurt. Can you please set me up an appointment as soon as you can. I don't want to lose my front tooth." *Id*. at 35. Again, Cabagua was informed he was on the routine waitlist. On July 18, 2022, Cabagua submitted a dental service request that stated: "The teeth that need to be filled are causing me severe pain. Can you please see me as soon as possible. Thanks." In response, Dr. Punla Smith placed Cabagua on the essential waitlist to have his pain evaluated and stated: "We are short staffed. Placed on list as of 12-16-2021" Also in response, someone wrote "No more DSRs are needed. Thank you." Dkt. No. 1-3 at 36. Dkt. No. 98 at ¶¶54-55.

A few days later, on July 26, 2022, Dr. Punla Smith performed a limited oral evaluation for Cabagua's complaints of pain. Dr. Punla Smith asserts that Cabagua complained about pain in tooth #9, #13, and #20, but Cabagua asserts that he complained about pain in #3, #9, #21, #27, and #28. Dr. Punla Smith took four x-rays and informed Cabagua that she would focus on only one tooth because this was an emergency appointment. According to Dr. Punla Smith, Cabagua asserted that tooth #20 hurt the worst as it was throbbing and sensitive to hot and cold. Dr. Punla

5

Smith then performed a series of tests on tooth #20 and #21. She noted an abscess on #21 and recommended that it be extracted. Cabagua refused the extraction and asked about treatment for his other teeth. He was informed that he was on the routine waitlist. Dkt. No. 98 at ¶¶56-58.

More than six months later, on February 14, 2023, Cabagua submitted a health services request form that stated: "I've been waiting patiently for over 3-1/2 years to have my teeth filled. I have filed DSR requests and have been ignored. I've already had to have 5 of my teeth pulled because I never get called. Please help! I don't want to lose any more teeth." Dkt. No. 1-3 at 37. Dr. Punla Smith indicated in response that Cabagua was on the hygiene and routine waitlists and commented "we are short staffed." *Id.* On April 26, 2023, Cabagua informed the dental services unit that the Office of the Secretary had confirmed that he had not been seen for restorative work consistent with policy timelines. Dr. Punla Smith responded, "On list." Dkt. No. 1-3 at 38. Cabagua submitted more requests about having his teeth filled and about related pain on May 5, June 19, July 10, and October 10, 2023. The response was the same. Dkt. No. 98 at ¶¶59-60.

On July 10, 2023, Cabagua was seen for a hygiene appointment. The dental hygienist (not a Defendant) instructed Cabagua on flossing habits and informed him that he should brush his teeth before he goes to bed. She also applied a fluoride varnish on his teeth, which helped with the pain for about a week. Dr. Punla Smith also examined Cabagua and noted caries on teeth #3, #9, #27, and #28. Cabagua asserts that he also complained about tooth #21. He asserts that Dr. Punla Smith and Kirchhoff, the dental assistant, explained that he was still on the routine waitlist. Dkt. No. 98 at ¶¶61-62. On August 24 and October 11, 2023, Cabagua complained that his teeth still had not been treated and were causing him a great deal of pain. He received the same answer from Dr. Punla Smith: He was on the waitlist. Dkt. No. 98 at ¶¶61-64.

6

Finally, on February 21, 2023, Cabagua was seen by a dentist (not a Defendant) for the restoration of four teeth. The dentist excavated and filled teeth #9, #21 (the tooth that Dr. Punla Smith had recommended be extracted), #27, and #28. The dentist also took an x-ray of tooth #3 and informed Cabagua that the tooth was not restorable. He recommended the tooth be extracted, which Cabagua declined. Cabagua was instructed to monitor the tooth for symptoms and to submit a dental services request as needed. Dkt. No. 98 at ¶66.

On March 23, 2023, Health Services Manager Ludwig was asked by the institution complaint examiner to consult on an inmate complaint that Cabagua filed. Ludwig reviewed Cabagua's records and created a chronology of his dental encounters. Ludwig informed the institution complaint examiner that, per policy, routine dental care is to be completed within twelve to eighteen months. She stated that Cabagua's care fell within this timeline. The institution complaint examiner recommended the inmate complaint be dismissed, and Dr. Panos dismissed the inmate complaint on March 28, 2023. Ludwig acknowledges that, after Cabagua appealed the dismissal, the Office of the Secretary informed her that she had referenced the wrong policy and that the correct policy allows for a maximum wait time of fifty-two weeks. Dkt. No. 98 at ¶¶73-90.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. All reasonable inferences are construed in favor of

7

the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

Cabagua asserts that Dr. Vachet, Dr. Punla Smith, and dental assistant Kirchhoff violated his rights under the Eighth Amendment when they delayed addressing his complaints of tooth pain. He further asserts that Health Services Manager Ludwig and Dr. Panos demonstrated deliberate indifference to his dental condition when they failed to address the delay. To prevail on a deliberate indifference claim under the Eighth Amendment, a plaintiff must prove that prison officials intentionally disregarded a known, objectively serious medical condition that posed an excessive risk to the plaintiff's health. *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) (citations omitted). The Seventh Circuit has repeatedly held that "[a] delay in treatment may show deliberate indifference if it exacerbated [the plaintiff's] injury or unnecessarily prolonged his pain." *Perez v. Fenoglio*, 792 F.3d 768, 777-78 (7th Cir. 2015). The parties agree that Cabagua's dental condition was objectively serious. The Court will therefore focus on each Defendant's response to that condition.

1. **A Jury Could Reasonably Conclude that Dr. Punla Smith Was Deliberately Indifferent to Cabagua's Dental Condition.**

In November 2021, Cabagua had a routine cleaning, at which time a dental hygienist noted caries in tooth #9, one of Cabagua's front teeth. *See* Dkt. No. 1-3 at 16. She told him to submit a request to have tooth #9 restored and to have tooth #3 evaluated. A couple of days after the cleaning, Cabagua submitted a dental services request asking that his front tooth be filled. It is not clear why, but Dr. Punla Smith placed Cabagua on the hygiene list for 2022; she did not place him on the routine waiting list to have tooth #9 restored. A month later, Cabagua submitted another request about having tooth #9 filled. In mid-December 2021, Dr. Punla Smith placed Cabagua on the routine waiting list for tooth restoration.

Over the course of the next seven months, Cabagua submitted at least five dental services requests with increasingly desperate pleas for attention. Although his initial request asked only that he be scheduled to have a single tooth filled, he began to complain about temperature sensitivity and severe pain in multiple teeth. Dr. Punla Smith finally scheduled him for an evaluation on July 26, 2022. Despite Cabagua's complaints that he was experiencing pain in multiple teeth, she informed him she would treat only one tooth. When Cabagua asked about the other teeth, he was informed he was on the routine waitlist. When Cabagua declined to have a tooth with an abscess extracted, no other treatment was provided.

Cabagua continued to wait, and he continued to submit dental services requests about the pain his teeth were causing. The response from Dr. Punla Smith was always the same: The dental services unit is short-staffed, and Cabagua is on the waitlist. During a routine cleaning on July 10, 2023, Dr. Punla Smith noted carries on teeth #3, #9, #27, and #28. Cabagua also complained about pain in tooth #21. Dr. Punla Smith's only response was to confirm that Cabagua was on the waitlist. Finally, on February 21, 2023, more than a year after Cabagua began to complain about

9

severe pain and temperature sensitivity in multiple teeth, he was seen by a dentist who filled teeth #9, #21, #27, and #28. The dentist, like multiple dentists before him, also recommended that tooth #3 be extracted, but Cabagua has yet to act on that recommendation.

Dr. Punla Smith herself explains, "[t]he 'routine wait list' was designed for dental conditions such as cavities, broken or cracked filings, or restorative care where delay in treatment would not result in a serious health risk *or discomfort to the patient*." Dkt. No. 22 at ¶14. Given the increasing desperation in Cabagua's dental services requests regarding pain and temperature sensitivity in multiple teeth, a jury could reasonably conclude that Dr. Punla Smith was deliberately indifferent to his condition when she repeatedly refused to prioritize his care over others who were not complaining of pain or when she refused to provide him with additional pain relief given that the medication he had been prescribed for other conditions was insufficient to address the pain from his teeth. Moreover, during the only "emergency" appointment she scheduled to evaluate his pain, Dr. Punla Smith inexplicably informed Cabagua that she would treat only one tooth, despite him complaining about pain from multiple teeth. And when he refused extraction for a tooth (that was later restored by a different dentist), she ended the appointment without offering to treat any of the other teeth causing him pain.

Dr. Punla Smith asserts that the delay was not her fault because the routine waitlist grew to unmanageable proportions during the pandemic and the dental services unit is short-staffed. She states that she has been trying to catch up ever since she returned to the institution in 2021, but she can see only so many patients in one day. Dkt. No. 22 at ¶¶57-59. But Dr. Punla Smith offers no evidence to support a conclusion that the "unmanageable proportions" of the waitlist and short staffing were the cause of the delay rather than her deliberate indifference to Cabagua's condition. Her say-so is insufficient at this stage. Summary judgement "is the 'put up or shut up'

moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Schact v. Wis. Dep't of Corr.*, 175 F.3d 497, 503-04 (7th Cir. 1999). Indeed, Cabagua has highlighted other inmates who received treatment before him even though they were added to the routine waitlist after him. *See* Dkt. No. 104 at ¶¶19, 22. In any event, Dr. Punla Smith does not explain why she did not move Cabagua from the routine waitlist to the essential waitlist in response to his persistent and increasingly desperate complaints of pain. Accordingly, there is a triable issue regarding whether the delay in Cabagua's treatment was due to Dr. Punla Smith's deliberate indifference to his condition.

Dr. Punla Smith also is not entitled to qualified immunity. The general standard for liability under the Eighth Amendment for a delay in treating a painful dental condition was well-established at the time of this event. *See Berry v. Peterman*, 604 F.3d 435, 438, 441 (7th Cir. 2010). "The purpose of the doctrine of qualified immunity is to shield public officers from liability consequent upon either a change in law after they acted or enduring legal uncertainty that makes it difficult for the officer to assess the lawfulness of the act in question before he does it." *Walker v. Benjamin*, 293 F.3d 1030, 1040 (7th Cir. 2002). If Dr. Punla Smith conducted herself in the manner that Cabagua asserts, then her response to Cabagua's requests for treatment could reasonably be found to violate the Eighth Amendment. Dr. Punla Smith is therefore not entitled to summary judgment on the basis of qualified immunity. *See Payne v. Pauley*, 337 F.3d 767, 776-81 (7th Cir. 2003) (holding that fact questions precluded summary judgment on issue of qualified immunity).

## 2. No Jury Could Reasonably Conclude that Dr. Vachet Was Deliberately Indifferent to Cabagua's Dental Condition.

Dr. Vachet first learned of Cabagua's complaints of tooth "deterioration" on January 11, 2021. At this point, Cabagua had been on the routine waiting list for about a month. Dr. Vachet explains that, because Cabagua did not mention pain or other symptoms suggesting that immediate treatment was required, she believed it appropriate that he remain on the routine waitlist. About three months later, on April 8, 2021, Cabagua noted for the first time that other teeth were beginning to bother him. Dr. Vachet believed that this change in condition warranted moving him to the essential waitlist. She evaluated him a week later and over the next couple of weeks completed restoration of the tooth that could be saved. She also referred him to the dentist responsible for extractions to address the three teeth she concluded could not be saved. Dr. Vachet had no further involvement in Cabagua's dental care.

No jury could reasonably conclude that Dr. Vachet was deliberately indifferent to Cabagua's dental condition. Cabagua insists that because he used the word "deteriorating," Dr. Vachet should have inferred that he was in pain and/or that the single tooth he complained about actually meant he was complaining about multiple teeth. But no jury could reasonably interpret Cabagua's dental services requests in that way. Dr. Vachet was entitled to take Cabagua at his word, and Cabagua initially complained only about a single tooth without mentioning pain or any other serious symptoms. *Everyone* who seeks non-routine dental treatment does so because they believe the quality of their teeth are deteriorating, and nothing in Cabagua's initial requests suggested that his concern should be prioritized over others' concerns. Once Cabagua indicated the problem was progressing, Dr. Vachet prioritized his care, and within several weeks she fully resolved the issue that was within the scope of her practice. She also promptly referred Cabagua

to the dentist responsible for extractions, which was outside the scope of her practice. Because the record shows that she provided prompt and thorough care, she is entitled to summary judgment.

3. **No Jury Could Reasonably Conclude that Ludwig, Dr. Panos, or Kirchhoff Were Deliberately Indifferent to Cabagua's Dental Condition.**

Health Services Manager Ludwig and Dr. Panos are entitled to summary judgment because no jury could reasonably conclude they had any involvement in the alleged violation of Cabagua's constitutional rights. Ludwig and Dr. Panos first became aware of Cabagua's complaints in March 2023 when Cabagua filed an inmate complaint about the delayed treatment of his teeth. But by then, Cabagua's issues had been resolved. A dentist had restored four teeth about a month earlier and, like multiple dentists before him, had recommended the extraction of tooth #3, which Cabagua continued to refuse. The Seventh Circuit explained long ago that "[o]nly persons who cause or participate in the violations are responsible . . . [and] [r]uling against a prisoner on an administrative complaint does not cause or contribute to the violation." *See George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007). In short, ruling on a completed act of misconduct does not violate the Constitution. *Id.*

Kirchhoff is also entitled to summary judgment. She explains that as a dental assistant she does not provide independent or direct care to patients, nor does she make decisions about patient care. Her duties include organizing and sterilizing equipment, taking x-rays, scheduling appointments, and managing waitlists. She asserts that, after a dentist triages a dental services request, she places the patient on whatever list the dentist decides is appropriate. Dkt. No. 83 at ¶¶3-4. Given the limited scope of Kirchhoff's duties, experience, and training, she is not liable for Dr. Punla Smith's decisions regarding which waitlist to place Cabagua on or what treatment to pursue. *See Miller v. Harbaugh*, 698 F.3d 956, 962 (7th Cir. 2012) (explaining that "defendants cannot be thought to be reckless if the remedial step was not within their power"); *Burks v.*

13

*Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) (Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job."). In short, given the nature of Kirchhoff's role, she was entitled to defer to the treatment decisions of the dentists she worked for. *See Berry*, 604 F.3d at 440 (noting that "the law encourages non-medical security and administrative personnel at jails and prisons to defer to the professional medical judgments of the physicians and nurses treating the prisoners in their care without fear of liability for doing so"). She therefore is entitled to summary judgment.

**IT IS THEREFORE ORDERED** Dr. Vachet's motion for summary judgment (Dkt. No. 63) is **GRANTED**. The clerk's office is directed to terminate her from this action.

**IT IS FURTHER ORDERED** that Kirchhoff, Ludwig, Dr. Panos, and Dr. Punla Smith's motion for summary judgment (Dkt. No. 80) is **GRANTED in part** and **DENIED in part**. Cabagua's claims against Kirchhoff, Ludwig, and Dr. Panos are **DISMISSED**, so the clerk's office is directed to terminate them from this action.

**IT IS FURTHER ORDERED** that Cabagua's motion for leave to file excess pages (Dkt. No. 97) is **GRANTED**.

The clerk will place this matter on the calendar for a telephonic status conference. In the interim, the parties are directed to discuss whether mediation with a magistrate judge might resolve what remains of this action.

Dated in Milwaukee, Wisconsin this 11th day of February, 2026.

_____
STEPHEN C. DRIES
United States Magistrate Judge